54   567
119a 175

THE PEOPLE ex rel. THOMAS STAPLETON AND ANOTHER, RESPONDENTS (NINTH WARD), v. GEORGE H. BELL AND ANOTHER, APPELLANTS, AND FIVE OTHER CASES, COVERING TWO DISTRICTS OF THE SEVENTH WARD, ONE DISTRICT OF THE FIRST WARD, EIGHTH WARD AND TWELFTH WARD OF THE CITY OF TROY.

*Inspectors of election — duty of, to allow votes, believed by them to be illegal, to be sworn in.*

Upon an appeal from an order directing that a *mandamus* issue commanding the defendants, who were inspectors of election, and who, together with the relators, composed the board of inspectors for the election district in the ninth ward of the City of Troy, to sign the returns of the said election, it appeared that, upon the close of the polls on the day of election, the board counted the ballots, canvassed the votes and proclaimed the results in that district, and that such results, so proclaimed, were correctly stated in returns in the form required by law, but that the defendants refused and still refuse to sign them.

The defendants made affidavits that, "during said election, to deponents' knowledge, there were at least seventy fraudulent votes offered at said polls. By

fraudulent votes deponents mean that persons who did not reside within said election district, and who were not registered and who were not entitled to vote, appeared before the said board and fraudulently and falsely represented themselves to be registered voters, which they were not, to deponents' knowledge. Upon offering said fraudulent votes, deponents would object to their receipt; said persons were challenged and sworn and their answers were unsatisfactory. In many cases opportunity was not given to deponents to question the voters, and the said ballots were not, nor was any one of them "received " by said board, or a majority thereof," but that the relators, contrary to deponents' protest, put the same into the ballot boxes.

Upon the argument the defendants' counsel stated the purport of this affidavit to be, that the defendants knew or believed that the seventy votes which were deposited, were deposited by persons who falsely personated persons whose names were on the register for that district.

*Held,* that the defendants' claim, in regard to the responses of the parties challenged, that " their answers were unsatisfactory," did not show that their answers were not as full and complete as the law required.

That as the defendants' affidavit did not state that the questions put to persons challenged were not fully answered as required by the Election Code, it must be assumed that the answers were full ; that if the defendants believed they were false they should have pointed out in what respect the qualifications of the challenged persons appeared to them to be insufficient ; that if the parties challenged still persisted in their claim to vote. and made the statement as to residence required by section 7 of chapter 576 of 1880, the inspectors' disbelief in the honesty of the statement, or in the identity of the person, must yield, and that the votes should be received.

It was claimed by the defendants that these ballots were not " received," because the defendants did not consent to their deposit in the ballot-box.

*Held,* that the presumption was, that the statements made upon oath were true ; that the party challenged must be assumed to be innocent until he is proved to be guilty; that the inspectors by disregarding the oath of the voter and condemning him as perjured upon their own knowledge, or upon their confidence that they had knowledge upon the subject, would deprive him of the opportunity to prove before the proper tribunal that they were mistaken or ignorant, in other words, deprive him, without due process of law, of the right which he had established according to the forms of the law, and that they would thus arrogate to themselves a jurisdiction which the election laws did not confer upon them and which the Constitution forbade. (FISH, J., dissenting.)

APPEAL by the defendants from an order made at a Special Term held in Rensselaer county, which was entered in the office of the clerk of the county of Rensselaer on November 18, 1889, directing that a peremptory writ of *mandamus* issue against the defendants, requiring them forthwith to duly sign the last election returns of the election district of the ninth ward, in the City of Troy, and to certify to the correctness thereof.

*George B. Wellington*, for the appellants.

*R. A. Parmenter*, for the relators respondents.

LANDON, J. :

The relators and the defendants are inspectors of election, and together composed the board of inspectors for the election district in the ninth ward of the City of Troy at the last general election. Upon the close of the polls on the day of the election the board, thus constituted, counted the ballots, canvassed the votes and proclaimed the results in that district. Thereupon such results were correctly stated in returns in the form required by law, and the relators signed the returns, but the defendants refused and still refuse to sign them. The Special Term by *mandamus* directed the defendants to sign the returns, and the defendants appeal from the order. The order should be affirmed unless the facts alleged by the defendants in justification of their refusal amount to a sufficient justification.

They make affidavits in their justification that " during said election to deponents' knowledge there were at least seventy fraudulent votes offered at said polls. By fraudulent votes deponents mean that persons who did not reside within said election district, and who were not registered and who were not entitled to vote, appeared before said board and fraudulently and falsely represented them-selves *to be registered voters, which they were not, to deponents' knowledge.* Upon offering said fraudulent votes deponents would object to their receipt; said persons were challenged and sworn, and their answers were unsatisfactory. In many cases opportunity was not given to deponents to question the voters, and the said ballots were not, nor was any one of them, received by said board or a majority thereof. Although said ballots were not received by the board and were not given at said election, nevertheless, the said Hassett and Stapleton, the other members of said board, contrary to the protest of deponents, took said ballots that were not given by any voter, and were not received by the board, and put said fraudulent ballots into the ballot-boxes in charge of said board at said election. Deponents are prepared to prove each one of the allegations herein made by reliable witnesses. Deponent did not sign

the returns referred to in the moving affidavits herein, for the reason that the same are incorrect. There were not given in said district the number of votes therein named, and there were not received by the various candidates the number of votes therein stated, in that there were upwards of seventy votes before referred to that were put into said boxes contrary to the protest of deponents, and without said ballots having been received by the board or a majority thereof."

Upon the oral argument counsel for defendants stated that the defendants knew or believed that these seventy votes were deposited by persons who falsely personated persons whose names were on the registry of electors for that district. Giving to the affidavit this construction, it is proper to examine and ascertain whether the affidavit shows that any of these votes were illegally received. The persons offering them were challenged and sworn and made answer. Their answers were not satisfactory to the defendants, but that is very far short of a statement that their answers were not as full and complete as the law requires. The case of the defendants rests upon the position that the defendants were acting judicially, and that upon hearing the answers of the persons challenged, if defendants did not believe what they swore to, or from their own knowledge of the men and of the facts believed, that they committed perjury, they had the right to decide the case in conformity with their own knowledge and belief, in disregard of the sworn statements of the person offering to vote.

In our opinion such is not the law. The election laws of this State have been framed with the intent to prescribe as fully as necessary the tests by which the right of a person to vote shall be determined, and to leave as little as possible to the discretion or judgment of the inspectors of election. These officers, as their name implies, are inspectors, and not judges, of the election. The intent of the statutes is that the inspectors shall follow the directions prescribed, and that by so doing the right to vote of any person whose right is challenged will thereby be determined; that is, the fact will be so manifest that the inspectors cannot fail to perceive it.

Thus, prior to the day of election, the persons entitled to vote must be registered. This is not conclusive in their favor, but if the name of any person is omitted or stricken from the registry the

absence of his name from the registry on election day is conclusive against his right to vote. (Chap. 576, §§ 6, 20, Laws of 1880, applicable to the City of Troy.)

When a person offers his vote, manifestly the first duty of the inspectors is to look for his name upon the registry. If it is not there, his vote must be rejected. But in the case before us the persons whose votes are under consideration gave names which were found upon the registry. The defendants, we presume, challenged these persons because they did not believe them to be the persons of the names they gave, or the persons actually registered. The statutes prescribe a preliminary oath (Election Code, § 260; Laws 1842, chap. 130, tit. 4, § 13), and if the questions put to the challenged person under that oath are not fully answered his vote may be rejected. (1 id., §§ 261, 262.) The affidavit does not state that these questions were not fully answered, but does state that the answers were not satisfactory to the defendants. We must presume that the answers were full, but the defendants believed they were false. If the defendants could point out, in any respect, the qualification in which the challenged person appeared to them to be deficient, it was their duty to do so (Id., § 263) and then if he persisted in his claim to vote, the general oath should be administered to him. (Id., § 264.) The defendants allege that they were not, in some cases, given by their associates an opportunity to question the voters, but they do not allege that any statutory question was withheld by the inspectors who did question them. We must presume that all the questions proper to be asked were asked, and that the answers were full.

The answers made by the persons taking these oaths were made under the penalties denounced by these statutes against perjury. The questions permissible are comprehensive enough to embrace fully the fact of the identity of the person challenged with the registered person whose name he gives as his own. Besides section 7 of chapter 576, Laws of 1880, provides that: "Every elector at the time of offering his vote shall, if required, truly state the street in which he resides, and if the house, lodging or tenement in which he resides is numbered, the number thereof; * * * and in case of the refusal to make the statement as aforesaid the vote of such elector shall not be received." This statement is not required to be

made upon oath, but its truthfulness is thus exacted: "Any person who shall willfully make any false statement in relation thereto shall be deemed guilty of a misdemeanor, and shall, upon conviction, be punished with a fine of fifty dollars or by imprisonment in the county jail * * * for a period of ten days, or by both such fine and imprisonment."

The statutes having carefully prescribed the tests to determine the right of any person to vote, the proposition that the inspectors can in addition thereto prescribe or impose such other and further tests as they may deem adapted to the particular case before them, is wholly inadmissible. If the person offering to vote does comply with the statutory tests, the inspectors' disbelief in his honesty or identity must yield, and the vote should be received. There is no allegation that these seventy voters did not comply with the statutory tests, and hence the conclusion follows that their votes were lawfully received, whether the defendants were or were not satisfied, and having been received and counted, the proper returns should be made and signed. It is, however, urged that these ballots were not "received," because the defendants did not consent to their deposit in the ballot-box. To test this question, suppose one of these voters should sue one or all of the inspectors for refusing to receive his vote. He certainly would be defeated, upon the facts here presented, showing its receipt. The proposition that if the inspectors know, of their own knowledge, that the person offering to vote is not the person actually registered, they may disregard his statement and oath and reject his vote, is open to other objections. The presumption is that the statements made upon oath are true, and that the accused voter is innocent until he is proved to be guilty. It is plain that the inspectors who disregard the oath of the voter and condemn him as perjured upon their own knowledge, or upon their confidence of having or acquiring knowledge, deprive the voter of the opportunity to prove before the proper tribunal that they are mistaken or ignorant; in other words, deprive him without due process of law of the right which he has established according to the forms of law, and that they thus arrogate to themselves a jurisdiction which the election laws do not confer upon them, and which the Constitution seems to forbid. It would be an extraordinary law which should assume to clothe the inspectors of election with

judicial functions, and then add to such functions the power to consider their personal knowledge of the facts as paramount and conclusive evidence of them. Such judges thus empowered would need to be highly endowed with intelligence and virtue. If the inspectors of election are such judges, then, in the final test, the right to vote does not depend upon the written law, but upon the secret consciousness of the inspectors. It is easy to believe that partisan inspectors might not rise to the high requirements of their office, and that if a choice of evils is to be made, reliance upon the law is the lesser evil. We admit that no person can lawfully acquire the right to vote by the false personation of another or by perjury, for these acts are crimes. We admit, also, that every person who sees another engaged in committing a crime may reasonably interpose to arrest and prevent it, but he takes upon himself every risk of mistake, and, of course, the burden of proving before the proper tribunal, if prosecuted, that his interposition was warranted because of the attempted criminal act of the other. It is true that no person abdicates his personal rights by accepting the office of inspector of election; but it is also true that in this proceeding we cannot try any such issues between the inspectors and the accused voters; the latter are not present as parties and are not heard in their own behalf; the issues are not made. Besides the votes were received and not rejected. If they had been rejected, only those received could be returned.

The defendants believe that some of the votes were illegally cast. Belief is not proof. To reverse the order appealed from would be to suppress the vote of the district, and to invite occasion for like suppression in the future in other districts. If any person aggrieved by the returns desires a judicial investigation as to the illegality of any of these votes, the law prescribes the procedure. The law prescribes the punishment for illegal voting. The votes received must be returned. It follows that the order appealed from should be affirmed.

In the five other cases herewith argued the orders appealed from are also affirmed.

LEARNED, P. J., concurred.

FISH, J. (dissenting):

The order from which this appeal is taken directs the issuing of a peremptory *mandamus* to the defendants, requiring them " forthwith

to sign the election return heretofore filed in the office of the county clerk of Rensselaer county, *and to certify to the correctness thereof.*"

The defendants in answer to the motion state that they did not sign the returns for the reason that the same are incorrect; that there were not given in said election district the number of votes therein named; that there were not received by the various candidates the number of votes therein stated; and further state that there were upwards of seventy votes put into the ballot-boxes from which these returns are made, without having been received by the board of inspectors, or a majority of them. This statement is sworn to by the defendants, who constitute half of the full board of inspectors. Their affidavits are entitled to at least as much weight as that of the relators. The evidence before this court is equally balanced as to the correctness of the returns in question.

If the order contemplated the making and signing by the defendants of a return of the election, it might not be offensive to their sense of propriety. Such an order would be well sustained by judicial authority. If these defendants were contumacious, and refused to make any return, it would be proper for this court to give them direction, not to make or sign any particular return, or to certify to the correctness of any particular return, but simply to make a return of the election. (*People ex rel Francis* v. *Common Council of Troy,* 78 N. Y., 33.)

But the order calls upon the defendants to certify to the correctness of the return now on file, made up by the relators who were associate inspectors, and which return defendants protest under oath is not correct, but is false in substantial particulars. By this order the defendants are required, by a peremptory *mandamus,* to certify to the correctness of a thing which they say they know to be incorrect; which they know to be a false return; in fact to commit an act which, if voluntarily done, would be a crime, and render them liable to indictment.

I do not think that the arbitrary and extraordinary powers of this court ought to be exercised to enforce action upon such doubtful premises, and, above all things, to require public officers, acting under a solemn oath, to do a thing which they protest will be untruthful when done. There is no precedent for such an action in any case where there was a *bona fide* dispute about the facts. It

is only in clear and unquestionable cases that this extraordinary process is called into action.  (See *The People ex rel. Mott* v. *Supervisors*, 64 N. Y., 600; *The People ex rel. Slavin* v. *Wendell*, 71 id., 171; *The People ex rel. Lunney* v. *Campbell*, 72 id., 497; *The People ex rel. Cahill* v. *Hines*, 10 Weekly Dig., 88.)

Even if it be conceded that inspectors of election are strictly ministerial officers having no judgment or discretion to exercise, and who may not, under any circumstances, reject the vote of any person who presents himself and takes the formal oath, no matter how transparent a fraud is perpetrated, still, they ought not to be compelled to certify to the correctness of that which they do not believe to be true, or that which they protest is not true.   But I am unwilling to hold that the election inspector is nothing, unless it be a clerk of the election, bound to receive and deposit in the ballot-box the votes of all who may be willing to take the prescribed oath, and whose only duty or authority beyond that is to count the ballots and certify the result.   One inspector could do that, with the aid of the watchers to see that the count was right.

Why is a board of inspectors provided if they have no judgment to exercise in any case ?   And especially, why is there provided for the City of Troy a non-partisan board, made up of two members from each political party, unless there is something to be done or determined, upon which the minds of men may differ ?   It is claimed by the learned counsel for the relators, in his very able argument, that every person who offers his vote, if he takes the oaths required, determines for himself the question of his right to vote.   If he testifies that he is the man named on the registry as John Doe, and that he resides at the place named, and thus fills out the formal requirements, his vote must be accepted by the inspectors, even though they all know that he is not the John Doe entered on the register, and know that he is not entitled to vote.   Can this be so ?   Is it possible that a board of election inspectors, consisting of four members, must stand by and see an open fraud upon the franchise committed, knowing it to be such, and yet without power to prevent it ?   It is plain that such a holding must lead not only to the forced reception and count of the unlawful votes, but to the exclusion and disfranchisement of those entitled to vote whose places upon the registry are usurped.

There may be many John Smiths residing in the same election district, some of whom are registered and entitled to vote, others not. Is there no power in a board of inspectors, so far as they know, to see that the genuine John Smiths are not robbed of their franchises by those who assume their place on the register? Is it the law that a board of election inspectors have no power or right to decide between conflicting claims which may be made to fill the places of the registered John Smith? Must the inspectors accept the votes of the first men who come, and who come early, when they know that the early comers are not the true electors? It must be kept in view that inspectors of election are public officials whose duty it is to preside at the elections. It would seem as if they should be clothed with power to protect the ballot-box against such frauds as appear openly and are known to them

In the case before us the defendants make affidavit, that more than seventy votes were put in the ballot-boxes in question without the consent or action of the board of inspectors, and which came from persons who they knew were not legal voters and who were not registered. These ballots were taken and deposited in the ballot-boxes by one or two of the inspectors, against the protest of defendants, who constituted half of the board and were not, therefor, received by the board. If this statement is true, the ballot-boxes contained the large number of ballots referred to, which had not, in contemplation of law, been received by the inspectors, any more than if the persons who offered them had, with strong hand, made the deposit. And if the ballot-boxes were thus freighted with such ballots, deposited without the direction of the board, no correct count could be made of the votes received. The omission of the inspectors to make a return will not have the effect to destroy the votes of the legal electors, or prevent the election of any candidate, who received a majority of the legal votes. It will leave it open to other modes of proof to ascertain the result. A great inconvenience may result, not so great, however, as may come if the principle upon which this order is granted shall prevail. With great deference to the opinion of my distinguished brethren, and fully impressed with the desirability, on so vital a question, of harmonious judicial results, I am, nevertheless, persuaded that the extraordinary powers of this court will not be well exercised by directing a manda-

datory writ to these defendants requiring them to certify to the correctness of a return which they protest is not correct or true.

With much reluctance, therefore, I dissent from the conclusions of a majority of the court.

Orders affirmed in each case.